AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED

SEP 13 2019

CLERK U.␣␣␣␣␣␣␣␣␣␣
SOUTHERN DISTRICT OF CALIFORNIA
BY␣␣␣␣␣␣␣␣␣␣␣␣␣␣␣ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One red Apple iPhone with a pass code of "159632"<br>belonging to Andres YEE ("Target Device 6") | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No.<br><br>'19 MJ  3951 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-6 (incorporated herein)

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-6 (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 841 and 846,<br>and Sec. 843(b); 18 U.S.C.<br>Sec. 2 | Distribution and Possession with Intent to Distribute Controlled Substances (and<br>Conspiracy); Unlawful Use of a Communication Facility; Aiding and Abetting |

The application is based on these facts:

See attached Affidavit (incorporated herein)

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sarah Duray, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___9/12/19___

City and state:  San Diego, California

_____
*Judge's signature*

Hon. Linda Lopez, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>(1) One black Apple iPhone, associated with telephone number 619-961-9586, a pass code of "142535" belonging to Moises CORONA-Villagomez ("**Target Device 1**");<br><br>(2) One black Apple iPhone with a pass code of "020292" belonging to Richard Joseph GONZALEZ ("**Target Device 2**");<br><br>(3) One beige Apple iPhone in a clear case with a pass code of "071101" belonging to Alberto VILLARRUEL Jr. ("**Target Device 3**");<br><br>(4) One black LG cellular telephone (IMEI: 355380097999202) with a pass code of "619664" belonging to J.A.P. (a minor) ("**Target Device 4**");<br><br>(5) One black Samsung Galaxy S8+ (IMEI: 357759082132234) with a pattern pass code of "M" belonging to Enrique LOPEZ-Magaña ("**Target Device 5**"); and<br><br>(6) One red Apple iPhone with a pass code of "159632" belonging to Andres YEE ("**Target Device 6**"). | **AFFIDAVIT OF SPECIAL AGENT SARAH DURAY IN SUPPORT OF A SEARCH WARRANT** |

I, Special Agent Sarah Duray, having been duly sworn, declare and state as follows:

## I.

## INTRODUCTION

1.    I make this affidavit in support of an application for a warrant to search the following electronic device:

(1) One black Apple iPhone in a black case, associated with telephone number 619-961-9586 and a pass code of

"142535" belonging to Moises Alonso CORONA-Villagomez ("**Target Device 1**");

(2) One black Apple iPhone with a pass code of "020292" belonging to Richard Joseph GONZALEZ ("**Target Device 2**");

(3) One beige Apple iPhone in a clear case with a pass code of "071101" belonging to Alberto VILLARRUEL Jr. ("**Target Device 3**");

(4) One black LG cellular telephone (IMEI: 355380097999202) with a pass code of "619664" belonging to J.A.P. (a minor) ("**Target Device 4**");

(5) One black Samsung Galaxy S8+ (IMEI: 357759082132234) with a pattern pass code of "M" belonging to Enrique LOPEZ-Magaña ("**Target Device 5**"); and

(6) One red Apple iPhone with a pass code of "159632" belonging to Andres YEE ("**Target Device 6**") (collectively, the "**Target Devices**");

and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same) and Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility; and Title 18, United States Code, Section 2, Aiding and Abetting the Distribution of or Possession with Intent to Distribute a Controlled Substance (the **Target Offenses**).

2.      The **Target Devices** were seized from Defendants (1) Moises Alonso CORONA-Villagomez, (2) Richard Joseph GONZALEZ, (3) Alberto VILLARRUEL Jr., (4) J.A.P. (a minor), (5) Enrique LOPEZ-Magaña, and (6) Andres YEE (collectively, the "**Defendants**") at the time of their arrest in the parking lot of a fast food restaurant located at 1820 Main Court in Chula Vista, California on August 8, 2019. CORONA-VILLAGOMEZ, GONZALEZ, LOPEZ-MAGAÑA, and YEE are currently subject to federal criminal prosecution. Alberto VILLARRUEL Jr. and J.A.P. are not currently being prosecuted. The **Target Devices** are currently stored as evidence at the Drug Enforcement

1   Administration (DEA) San Diego Field Division (SDFD) located at 4560 Viewridge

2   Avenue, San Diego, CA 92123.

3       3.      The search of the **Target Devices** supports an investigation and prosecution

4   of Defendants for the Target Offenses. Based on the information below, there is probable

5   cause to believe that a search of the **Target Devices**, as described in Attachments A1–A6

6   will produce evidence of the Target Offenses, as described in Attachments B1–B6.

7       4.      The following is based upon my experience and training, investigation, and

8   consultation with other law enforcement agents and officers experienced in narcotics

9   violations, including the Target Offenses. The evidence and information contained herein

10  was developed from interviews and my review of documents and evidence related to this

11  case. Because I make this affidavit for the limited purpose of obtaining a search warrant

12  for the **Target Devices**, it does not contain all of the information known by me or other

13  federal agents regarding this investigation, but only sets forth those facts believed to be

14  necessary to establish probable cause. Dates and times are approximate, and refer to Pacific

15  Standard Time (PST) unless otherwise specified.

## II

### AFFIANT'S EXPERIENCE AND TRAINING

18      5.      I am a Special Agent Criminal Investigator for the United States Drug

19  Enforcement Administration (DEA). I was hired by the DEA in May of 2018, and I

20  attended the DEA academy for approximately eighteen (18) weeks. At the DEA Academy,

21  I was trained in the various aspects of conducting narcotics investigations. In September of

22  2018, I was sworn as a DEA Special Agent (SA) and was assigned to DEA San Diego Field

23  Division (SDFD).

24      6.      Prior to being employed with the DEA, I was a Police Officer for the SDPD

25  from September of 2016 to May of 2018. I completed a 25 week California Peace Officer

26  Standards and Training (POST) P.C. 832 arrest course and have received certification

27  completion from POST. I was assigned to patrol in Mid-City Division where I was

28

1  responsible for responding to 911 radio calls as well as investigating and assisting with the
2  investigations of over 100 crimes occurring in the city of San Diego.

3      7.      While with the DEA, I have participated in approximately 100 narcotics
4  investigations and more than 50 arrests for violations of the California Health & Safety
5  (H&S) Code. These investigations and arrests involved: (1) unlawful importation,
6  exportation, manufacture, possession with intent to distribute and distribution of narcotics;
7  (2) the laundering of narcotics proceeds and monetary instruments derived from narcotics
8  activities; and (3) conspiracies associated with narcotics offenses. These investigations
9  have involved debriefing defendants, witnesses and informants, conducting surveillance,
10  assisting in court ordered interceptions, executing search warrants, seizing narcotics and
11  narcotics-related assets and making arrests for narcotics-related offenses.

12      8.      I am currently assigned to the DEA San Diego Field Division's (SDFD) San
13  Diego County Integrated Narcotics Task Force (NTF) Team 10 and have been since
14  September 2018. NTF Team 10 is comprised of DEA SAs, Task Force Agents (TFAs) and
15  Task Force Officers (TFOs) from the San Diego Police Department (SDPD), Department
16  of Homeland Security Investigations (HSI), Federal Bureau of Investigation (FBI) and
17  Department of Health Care Services (DHCS). NTF Team 10 primarily investigates illegal
18  drug trafficking organizations (DTOs) operating in the United States and internationally,
19  including those DTOs whose operations involve the distribution of wholesale quantities of
20  fentanyl, oxycodone, hydrocodone, other controlled pharmaceutical drugs, cocaine,
21  methamphetamine, marijuana, heroin and hashish in and around the San Diego, California
22  area. Team 10 focuses on investigating illegal drug distribution related to drug overdose
23  deaths in San Diego County.

24      9.      I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C)
25  of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make
26  applications for search and seizure warrants. I am authorized to investigate violations of
27  laws of the United States and to execute warrants issued under the authority of the United
28  States.

10. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have had training in investigations regarding the unlawful distribution and possession of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, Sections 841 and 846.

11. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have learned that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers, and portable radios to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice-mail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. Typically, drug traffickers are in telephonic contact with co-conspirators immediately prior to and following their illicit transactions to negotiate prices and quantities, coordinate meeting times and locations, and then to discuss future transactions or future payments if the narcotics were "fronted" (delivered without being paid for in advance).

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug traffickers and their co-conspirators will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug traffickers and their co-conspirators will use cellular/mobile telephones to negotiate the price, type, and quantity of drugs being sold to customers, and received from suppliers.

5

1         c.      Drug traffickers and their co-conspirators will use cellular/mobile

2 telephones to arrange times and places to meet with customers to deliver illegal drugs, and to

3 arrange times and places to meet with suppliers to receive illegal drugs.

4         d.      Drug traffickers and their co-conspirators will use cellular/mobile

5 telephones to notify or warn their accomplices of law enforcement activity to include the

6 presence and posture of marked and unmarked units, as well as ongoing enforcement

7 operations in their area.

8         e.      Drug traffickers and their co-conspirators will use cellular/mobile

9 telephones to notify or warn their accomplices of law enforcement activity to include the

10 presence and posture of marked and unmarked units, as well as the operational status of

11 checkpoints and border crossings.

12         f.      Drug traffickers and their co-conspirators often use cellular/mobile

13 telephones to record money owed to customers and suppliers and as evidence of past orders

14 received and/or delivered.

15         g.      The use of cellular telephones and other mobile communication devices

16 by conspirators or drug traffickers tends to generate evidence that is stored on the device,

17 including, but not limited to emails, text messages, photographs, audio files, videos, call logs,

18 address book entries, IP addresses, social network data, and location data.

19     13.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity

20 modules, are smart cards that store data for cellular telephone subscribers. Such data

21 includes user identity, location and phone number, network authorization data, personal

22 security keys, contact lists and stored text messages. Much of the evidence generated by a

23 smuggler's use of a cellular telephone would likely be stored on any SIM Card that has

24 been utilized in connection with that device.

25     14.    Based upon my training and experience as a Special Agent, and consultations

26 with law enforcement officers experienced in narcotics trafficking investigations, and all

27 the facts and opinions set forth in this affidavit, I have learned that cellular/mobile

28 telephones can and often do contain electronic records, phone logs and contacts, voice and

text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of cellular/mobile telephones and/or other mobile communication devices yields evidence:

      a.    tending to identify co-conspirators that possess with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

      b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances within the United States;

      c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

      d.    tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

      e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

      f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

//

//

//

## III

## STATEMENT OF PROBABLE CAUSE

**A.   DEFENDANTS' ARREST**

15.   On August 8, 2019, DEA SDFD San Diego County Integrated Narcotic Task Force (NTF) Team 10 Special Agents (SAs) and Task Force Officers (TFOs) arrested a Cooperating Defendant[1] for California Health and Safety code violations in San Diego County. During a post-*Miranda* interview, the CD said an individual—later identified as Moises Alonso CORONA-Villagomez—was capable of selling "blues" (counterfeit Oxycodone 30 mg pills), cocaine, and fentanyl.

16.   In the presence of officers, the CD used his cell phone to exchange calls and text messages with CORONA-Villagomez at telephone number 619-961-9586 (**Target Device 1**) to negotiate the purchase of one kilogram of cocaine and 400 "blues" for $26,000. The CD agreed to meet CORONA-Villagomez at a commercial business parking lot located at 1820 Main Court in Chula Vista, California to conduct the transaction.

17.   Subsequently, SAs and TFOs established surveillance around the designated meeting location off Main Street in Chula Vista, California. Shortly thereafter, agents and officers observed a white Honda hatchback arrive and park. Agents confirmed that the white Honda hatchback was registered to CORONA-Villagomez.

18.   Next, the CD telephonically communicated with CORONA-Villagomez, who said he arrived at the meeting location and that his "boy" was there as well, referring to his source of supply. Agents and officers observed CORONA-Villagomez meet with a second

---

[1] The CD began cooperating with investigators on August 8, 2019 for consideration of leniency and reduced sentencing. The CD did not cooperate in exchange for monetary benefits, and has not been provided any monetary compensation. The CD has been convicted of violation of California Health and Safety (H&S) Code section 11360(A) – transportation/sales of marijuana on August 24, 2005, H&S 11357(A) – possession of concentrated cannabis on July 5, 2007, H&S 11379(A) x 2 – transportation/sales of a non-narcotic controlled substance on August 5, 2009, H&S 11359 – possession of marijuana for sale on December 1, 2009,  and H&S 11351 – possession of a narcotic controlled substance for sale on February 8, 2012.

1  male, later identified as GONZALEZ, who arrived in another vehicle and parked behind

2  CORONA-Villagomez's Honda. Agents and officers then observed CORONA-

3  Villagomez open the Honda's rear hatch and GONZALEZ placed an unknown item in the

4  Honda's rear cargo area.

5       19.    After GONZALEZ placed the item in the Honda's cargo area, CORONA-

6  Villagomez got into the Honda's driver seat, and GONZALEZ got into the front passenger

7  seat. CORONA-Villagomez and GONZALEZ then drove the Honda to a different spot in

8  the parking lot and parked next to a black Jeep.

9       20.    Next, agents and officers observed CORONA-Villagomez and GONZALEZ

10  exit the Honda hatchback and meet with four individuals in the black Jeep (later identified

11  as VILLARRUEL, J.A.P., LOPEZ-Magaña and YEE). Subsequently, CORONA-

12  Villagomez telephonically communicated with the CD again, and instructed the CD to get

13  inside a Jeep with tinted windows when he/she arrived and described where the Jeep was

14  parked in the parking lot.

15      21.    Thereafter, agents and officers approached the Honda hatchback and the Jeep,

16  where CORONA-Villagomez, LOPEZ-Magaña, GONZALEZ, and YEE were standing

17  outside while VILLARRUEL and J.A.P. were sitting in the Jeep. Agents and officers

18  detained all six individuals for questioning. As agents and officers were speaking with

19  these six individuals, they discovered and seized a clear plastic bag containing

20  approximately 400 blue counterfeit Oxycodone 30 mg pills on the ground near the Honda

21  hatchback.[2] A field test of the suspected counterfeit Oxycodone 30 mg pills was conducted

22  and pills presumptively tested positive for the presence of fentanyl.

23      22.    Subsequently, a Customs and Border Protection Officer used a canine trained

24  to detect the presence of controlled substances to conduct a sniff of the Honda hatchback

25  _____

26  [2] The number count of the pills seized as described above is based on my visual
estimation, as well as on the number ordered by the CD which was to be provided to

27  him/her by CORONA-Villagomez that day. An exact count of the pills was not conducted
for officer safety purposes. The pills were submitted to the DEA SWRL for further analysis

28  and the results are pending.

1  and the canine indicated to the presence of drugs and alerted to the Honda. Additionally,

2  agents and officers looked through the rear window of the Honda and observed an orange

3  shopping bag with multiple packages of a white crystalline substance that they suspected

4  to be a controlled substance sitting in plain view in the rear hatch area of the Honda.

5  Thereafter, agents and officers conducted a search of the Honda hatchback. During the

6  search, agents and officers seized approximalty 10 pounds (4,801.8 grams) of

7  methamphetamine from two plastic shopping bags in the hatch area. The white crystalline

8  substance presumptively tested positive for the presence of methamphetamine.

9       23.    Additionally, agents and officers conducted a probable cause search of the

10  Jeep based on CORONA-Villagomez's instructions for the CD to enter the Jeep to conduct

11  the anticipated drug transaction. During the search, agents and officers discovered and

12  seized approximately one kilogram (944.4 grams) of cocaine from a plastic shopping bag

13  under the rear driver's side passenger seat. This substance presumptively tested positive

14  for the presence of cocaine. Agents seized all six **Target Devices** from the Defendants at

15  the time of their arrest.

16       24.    During a post-*Miranda* interview, CORONA-Villagomez admitted to making

17  arrangements to introduce a friend (*i.e.*, the CD) to GONZALEZ, who had in turn

18  coordinated the meeting with the occupants of the Jeep. As to the purpose of the meeting

19  between his friend and GONZALEZ, CORONA-Villagomez claimed they were just going

20  to talk. As to the "blues" that had been found on scene, CORONA-Villagomez stated he

21  was fairly sure that those were going to be sold to "his boy" (the CD) but claimed he did

22  not know who they belonged to. CORONA-Villagomez stated that his friend (the CD) was

23  going to come and meet them to purchase cocaine and "blues."

24       25.    Furthermore, during a post-*Miranda* interview of GONZALEZ, he admitted

25  to having contacted YEE via "Snapchat" in order to procure one kilogram of cocaine and

26  "blues" (suspected counterfeit Oxycodone pills) for them to be sold to an unspecified party

27  through CORONA-Villagomez. It is presumed that GONZALEZ and YEE used **Target**

28  **Device 2** and **Target Device 6**, which were seized from them at the time of their arrest, to

1   send and receive their communications through the Snapchat application. In addition, with

2   respect to the methamphetamine, GONZALEZ further admitted to having removed the

3   methamphetamine from his vehicle and then placing it into the rear hatchback of

4   CORONA-Villagomez's Honda prior to him and CORONA-Villagomez traveling over to

5   the store. The methamphetamine was not part of the transaction with the CD and

6   GONZALEZ did not say to he whom intended to deliver the methamphetamine.

7   GONZALEZ also said he met with the occupants of the Jeep, including YEE, who showed

8   him the kilogram brick of cocaine.

9       26.    YEE admitted during his recorded post-*Miranda* interview to having been

10  contacted by GONZALEZ via "Snapchat" and then in turn reaching out to LOPEZ-Magaña

11  in order to obtain the cocaine and "blues." YEE said that YEE, J.A.P., and VILLARRUEL

12  picked up LOPEZ-Magaña to go to Panda Express and LOPEZ-Magaña had a plastic

13  shopping bag when he got in the car. YEE said that LOPEZ-Magaña passed the shopping

14  bag around the car so that all of other three occupants (YEE, J.A.P., and VILLARRUEL)

15  could see the "brick" of cocaine and the blues. YEE said that LOPEZ-Magaña then

16  wrapped the shopping bag with a sweater to conceal it. YEE admitted that he was going

17  to receive $500.00 USD from LOPEZ-Magaña for coordinating the transaction.

18  Additionally, YEE also relayed that VILLARRUEL (user of **Target Device 3**) was going

19  to receive $500.00 USD from LOPEZ-Magaña for driving his vehicle to the drug deal.

20      27.    During LOPEZ-Magaña's recorded post-*Miranda* interview, he admitted to

21  procuring the kilogram of cocaine from an unamed source of supply. LOPEZ-Magaña then

22  stated YEE told him he could help sell the kilogram of cocaine and was to sell the kilogram

23  of cocaine to YEE for $10,000.00, who in turn was to pay LOPEZ-Magaña once the

24  kilogram was sold. Additionally, LOPEZ-Magaña stated YEE arranged to sell the kilogram

25  of cocaine for $21,000.00. LOPEZ-Magaña further stated he got into back seat of a black

26  Jeep where YEE was also seated. At that time, LOPEZ-Magaña stated YEE then told him

27  he was also going to sell the blue "M30" pills for $5.00 a pill but did not say how many

28  pills there were. Once they arrived at the location where the drug transaction was to take

1   place, LOPEZ-Magaña stated he saw a white sedan pull up occupied by an unknown male

2   driver (CORONA-Villagomez) and a male known to him as "Rick" (Richard

3   GONZALEZ). Furthermore, LOPEZ-Magaña also admitted to dropping and damaging his

4   cellular telephone (**Target Device 5**) subsequent to law enforcement contact.

5       28.     During VILLARRUEL's recorded post-*Miranda* interview, he denied being

6   paid $500 to drive LOPEZ-Magaña to the drug transaction. VILLARRUEL said that earlier

7   in the day he picked up J.A.P. and YEE at YEE's house and drove them to the beach to

8   deliver pills to YEE's girlfriend and that YEE told him they were delivering birth control

9   pills and not drugs. From the beach, VILLARRUEL said that he, J.A.P. and YEE went to

10  pick up LOPEZ-Magaña and that he agreed to drive LOPEZ-Magaña, J.A.P. and YEE to

11  the Panda Express to pick up money. VILLARRUEL also admitted that he had been

12  contacted on previous occasions to serve as a driver and admitted that he knew LOPEZ-

13  Magaña was involved in drug trafficking.

14      29.     At the time of his arrest, J.A.P. (the user of **Target Device 4**) had a bandage

15  of his forehead for a visible cut. It was later learned that J.A.P. had recently been the victim

16  of a home invasion robbery and had been struck in the forehead with a pistol during the

17  robbery. Notably, when law enforcement attempted to investigate the robbery, J.A.P.

18  refused to identify the items that were stolen and only said the perpetrators took some

19  "bags." During the interview related to the robbery, J.A.P. admitted to picking up and

20  delivering packages of narcotics on prior occasions. Based on my training and experience,

21  it is believed that the robbery was connected to J.A.P.'s involvement in drug trafficking

22  and the perpetrators stole narcotics from J.A.P.'s residence. During the interview with local

23  law enforcement, J.A.P. identified **Target Device 4** as his telephone when asked for his

24  contact information.

25      30.     As a result of the investigation and interviews conducted that night into the

26  early morning, CORONA-Villagomez, GONZALEZ, LOPEZ-Magaña and YEE were

27  transported to the Metropolitan Correctional Center (MCC) in San Diego, California for

28  violations of Title 21, United States Code, Sections 841 and 846 – Conspiracy to Distribute

and Possess with Intent to Distribute Cocaine, Fentanyl, and Methamphetamine on August 9, 2019. VILLARRUEL and J.A.P. were released into the custody of their respective parents. The **Target Devices** were seized as evidence and held pending this search.

31.     Based upon my experience investigating narcotics traffickers and the particular investigation in this case, there is probable cause to believe that aforementioned subjects used the **Target Devices** to coordinate the distribution of federally controlled substances on August 8–9, 2019. In addition, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information may be stored in the memory of the **Target Devices**, which may identify other persons involved in narcotics trafficking activities, including the sources of the methamphetamine, cocaine, and counterfeit oxycodone pills containing fentanyl. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to CORONA-Villagomez's, GONZALEZ's, VILLARRUEL's, J.A.P.'s, LOPEZ-Magaña's and YEE's narcotics distribution activites, such as telephone numbers, made and received calls, contact names, e-mail addresses, appointment dates, messages, pictures, and other digital information may be stored in the memory of the **Target Devices**.

32.     Finally, I also have learned that narcotics trafficking activities entail advanced planning to successfully acquire a supply chain and establish a distribution network. In my professional training, education and experience, I have learned that this requires planning and coordination in the days, weeks, and often months prior to the event. Further, given how quickly the Defendants were able to procure significant quantities of cocaine, methamphetamine, and counterfeit oxycodone pills containing fentanyl, there is reason to believe they have all been involved in drug trafficking for a substantial amount of time. Given this, I request permission to search the **Target Devices** for items listed in Attachments B1–B6 for the period of May 9, 2019, to August 9, 2019.

13

## III

## __METHODOLOGY__

33.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

34.     Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

35.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

1   review, and, consequently, may take weeks or months. The personnel conducting the

2   identification and extraction of data will complete the analysis within ninety (90) days of

3   the date the warrant is signed, absent further application to this court.

## IV

## CONCLUSION

6       36.    Based on all of the facts and circumstances described above, my training and

7   experience, and consultations with other law enforcement officers, there is probable cause

8   to conclude that Defendants utilized the **Target Devices** to facilitate the commission of the

9   Target Offenses.

10       37.    Probable cause exists to believe that evidence of the aforementioned offenses

11   exists on the **Target Devices** for the period of May 9, 2019, to August 9, 2019.

12       38.    Because the **Target Devices** were promptly seized during the investigation of

13   Defendants' drug trafficking activities and has been securely stored, there is probable cause

14   to believe that evidence of illegal activity committed by Defendant continues to exist on

15   the **Target Devices**.

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1    39.    Based upon my experience and training, consultation with other agents in

2  narcotics investigations, consultation with other sources of information, and the facts set

3  forth herein, I believe that the items to be seized set forth in Attachments B1–B6

4  (incorporated herein) are likely to be found in the property to be searched described in

5  Attachments A1–A6 (incorporated herein). Therefore, I respectfully request that the Court

6  issue a warrant authorizing me, or another federal law enforcement agent specially trained

7  in digital evidence recovery, to search the items described in Attachments A1–A6, and

8  seize the items listed in Attachment B1–B6.

9    I declare under penalty of perjury that the foregoing is true and correct to the best of

10  my knowledge and belief.

11  
_____
Special Agent Sarah Duray

12  Drug Enforcement Administration

13

14  Sworn to and subscribed before me this _____ day of September, 2019.

15

16  
_____
HON. LINDA LOPEZ

17  UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28

## **ATTACHMENT A-6**

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same) and Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility; and Title 18, United States Code, Section 2, Aiding and Abetting the Distribution of or Possession with Intent to Distribute a Controlled Substance (the **Target Offenses**) is:

> One red Apple iPhone with a pass code of "159632" belonging to Andres YEE ("**Target Device 6**")

**Target Device 6** is currently in the possession of the Drug Enforcement Administration (DEA) San Diego Field Division (SDFD) located at 4560 Viewridge Avenue, San Diego, CA 92123.

## ATTACHMENT B-6

Authorization to search **Target Device 6** described in Attachment A-6 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device 6** for evidence described below. The seizure and search of **Target Device 6** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of May 9, 2019 to August 9, 2019:

a.     tending to identify co-conspirators that possess with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

b.     tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances within the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances;

d.     tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

e.     tending to identify the user of, or persons with control over or access to, **Target Device 6**; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of the Target Offenses.